**DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS AND ST. JOHN**

**UNITED STATES OF AMERICA**

    **v.**

**YVONIA SAINTILMOND,**

        **Defendant.**

_____

3:25-cr-00035-RAM-EAH

**TO:** Kyle Payne, Esq., AUSA
      Jennie Espada, Esq.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** came before the Court for a bench trial on October 16, 2025. Defendant Yvonia Saintilmond, who waived her presence at the trial, *see* Dkt. No. 38, was represented by Attorney Jennie Espada, and the Government was represented by Assistant United States Attorney Kyle Payne. The Government charged Ms. Saintilmond by Information with Illegal Entry by an Alien, in violation of 8 U.S.C. § 1325(a)(1). *See* Dkt. No. 14. After the close of all evidence, Attorney Espada moved for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29, which also served as her closing argument. The Court took the matter under advisement. For the reasons that follow, the Court will deny Ms. Saintilmond's motion for judgment of acquittal. In weighing the evidence presented, the Court finds that the Government met its burden of proving Ms. Saintilmond's guilt beyond a reasonable doubt. Accordingly, the Court finds Ms. Saintilmond **GUILTY** on Count One of the Information, Illegal Entry by an Alien.

**BACKGROUND**

Prior to trial, the parties stipulated to the admission of Government Exhibits 1-8 and

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 2

Defense Exhibit 1. They also stipulated that Yvonia Saintilmond is an alien, which satisfies the first of the two elements of 8 U.S.C. § 1325(a)(1), that the defendant is an alien.

At trial, the parties waived opening arguments. The Government first called Special Agent Heather Macfarlane ("SA Macfarlane"), an officer with Homeland Security Investigations ("HSI") on St. Thomas. SA Macfarlane testified that, on April 9, 2025, she was working at the Red Hook Ferry Terminal on St. Thomas supporting Transportation Security Administration ("TSA") officers in a security surge screening operation as they inspected all passengers traveling on the ferry between St. Thomas and St. John. Her duty was to take part in checks of the passengers to verify their identifying documents and immigration status.

A TSA agent presented SA Macfarlane with Ms. Saintilmond for secondary inspection. Ms. Saintilmond provided her Employment Authorization Card that gave her name, her "A" number (the unique identifier for aliens in the United States, given by the United States Citizenship and Immigration Services ("USCIS")),[1] her date of birth, and country of birth (Haiti). Gov't Ex. 8.[2] Ms. Saintilmond also provided four pages of a USCIS "Notice of Action"[3]

---

[1] The Government's second witness, Jodi Luntsford, USCIS Field Director on St. Thomas, explained that the Department of Homeland Security ("DHS") is divided into three sections: USCIS, addressing immigration benefits; Customs and Border Protection ("CBP"), focusing on border protection; and Immigration and Customs Enforcement ("ICE"), focusing on enforcement.
[2] The numbers of the Government Exhibits presented at trial were different from the numbers of the Government Exhibits provided on Dkt. No. 44 (Exhibit List). The Court will use the exhibit numbers referred to at trial for clarity.
[3] SA Macfarlane explained that Notices of Action were issued to someone applying for some sort of immigration status in the United States.

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 3

form regarding her application for Temporary Protected Status[4] in the United States. Gov't Ex. 7. At this point, SA Macfarlane ran systems checks through various Government databases maintained by the Department of Homeland Security ("DHS") to verify Ms. Saintilmond's identification and her current status in the United States, using her "A" number and date of birth. A printout of the Central Index System, Gov't. Ex. 1, showed Ms. Saintilmond's country of birth and country of citizenship as Haiti, her date of entry ("DOE") into the United States as January 1, 2024, and the DFO ("Date File Opened") with DHS as April 23, 2024. That document indicated that Ms. Saintilmond was an "Asylee applicant w/o work auth." but did not indicate whether the asylum application had been approved.[5] After determining that Ms. Saintilmond did not have legal status to be in the United States, SA

---

[4] The USCIS website describes TPS as follows: "The Secretary of Homeland Security may designate a foreign country for TPS due to conditions in the country that temporarily prevent the country's nationals from returning safely, or in certain circumstances, where the country is unable to handle the return of its nationals adequately. USCIS may grant TPS to eligible nationals of certain countries (or parts of countries), who are already in the United States. * * * The Secretary may designate a country for TPS due to the following temporary conditions in the country:
- Ongoing armed conflict (such as civil war)
- An environmental disaster (such as earthquake or hurricane), or an epidemic
- Other extraordinary and temporary conditions

USCIS/Humanitarian/Temporary Protected Status/https://www.uscis.gov/humanitarian/temporary-protected-status (last visited October 23, 2025).

[5] During the bench trial, the parties sought to clarify why Gov't Ex. 1, printed on 4/9/25, stated that Ms. Saintilmond was "w/o [without] work authorization" even though she had been issued her Employment Authorization Card on October 24, 2024, Gov't Ex. 8. It was determined through Director Luntsford's testimony that Ms. Saintilmond had not received work authorization at the point her file was opened on April 23, 2024, and the exhibit was not updated at the point it was printed on April 9, 2025 to include that approval. Thus, the alleged inconsistency was a clerical error that was not fatal to the Government's case

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 4

MacFarlane detained her for further questions.[6]

Ms. Saintilmond was transported to the ERO ("Enforcement & Removal Office,")[7] located on Crown Mountain, St. Thomas. There, SA Macfarlane conducted more system checks. She ascertained from Gov't Ex. 2 (a printout from the ELIS2—Electronic Immigration

---

[6] The point at which Ms. Saintilmond was officially arrested was not exactly clear from SA Macfarlane's testimony Nevertheless, the Court pauses here to express some concern with the lawfulness of that arrest. By the time Ms. Saintilmond was detained, she was surely seized for the purposes of the Fourth Amendment. *See Torres v. Madris*, 592 U.S. 306, 312 (2021) ("the arrest of a person is quintessentially a seizure"). At the time of Ms. Saintilmond's arrest, SA Macfarlane had probable cause only to believe that Ms. Saintilmond had entered the United States illegally. Illegal entry is a misdemeanor offense. *United States v. Laville*, 480 F.3d 187, 191 (3d Cir. 2007). In the Virgin Islands, as in a vast majority of states, "a misdemeanor must be committed in the presence of the [arresting] officer in order to justify a warrantless arrest." *Id.* (citing 5 V.I.C. § 3562(1)). That law is congruent with a long-held understanding in federal law that "[t]he usual rule is that a police officer . . . may only arrest without a warrant one guilty of a misdemeanor if committed in his presence." *Carroll v. United States*, 267 U.S. 132, 156-57 (1925). That "usual rule" finds significant support throughout the United States's history and the history of the common law. *See Gonzalez v. United States*, 145 S. Ct. 529, 530-33 (2025) (Sotomayor, J., joined by Gorsuch, J., statement respecting denial of cert.) (discussing historical support for the "in-presence requirement" dating back to English common law and continuing through the founding of the United States "almost without exception"). While several circuit courts have held that the Fourth Amendment no longer protects persons from warrantless arrests for misdemeanors committed outside an officer's presence, *see id.* at 531-32 (collecting cases), the Third Circuit has not ruled on the validity of the in-presence requirement under the Fourth Amendment. *Cf. Laville*. 480 F.3d at 196 (rejecting *per se* rule that violation of Virgin Islands in-presence law automatically made arrest unconstitutional but not addressing validity of in-presence requirement under the Fourth Amendment). Because the Fourth Amendment "must provide *at a minimum* the degree of protection it afforded when it was adopted," *Lange v. California*, 594 U.S. 295, 309 (2021) (emphasis in original), and because warrantless arrests of misdemeanants were generally prohibited for crimes committed outside of an officer's presence at the nation's founding, the Court questions whether Ms. Saintilmond's warrantless arrest was lawful under the Fourth Amendment. Nevertheless, the Defendant did not raise this issue, and the Court does not consider whether the arrest was, in fact, unlawful.

[7] The ERO Office is part of ICE.

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 5

System regarding "initial permission to accept employment") that Ms. Saintilmond applied for employment authorization on October 8, 2024, and received permission and was issued an Employment Authorization Card on October 24, 2024. That record also showed her "Admission Port of Entry" as St. John, Virgin Islands and "Date of Admission" as January 1, 2024. Gov't Ex. 3, another ELIS-2 record concerning Ms. Saintilmond's "Initial application for Temporary Protected Status," showed data points that matched many details from Exhibit 2, except that it indicated her Date of Admission as January 1, 2023. It also showed she had a Haitian passport that expired on June 17, 2028. Gov't Ex. 4 indicated that Ms. Saintilmond had filed an I-589 Asylum Form. It indicated her Date of Entry into the United States as January 1, 2024, her asylum filing date as April 23, 2024, and that her current status was "eligible for interview." Gov't Ex. 6 concerned Ms. Saintilmond's "Encounter History" with immigration officials. SA Macfarlane explained that the form populated from biometrics (fingerprints) in the DHS system and showed any encounter Ms. Saintilmond had with immigration officials. The first page showed SA Macfarlane's interaction with her on April 9, 2025, and provided a summary of that interaction.[8] The form also showed a May 14, 2024 encounter where Ms. Saintilmond was processed for part of her asylum application.

SA Macfarlane stated that the designated ports of entry on St. Thomas were Cyril King

---

[8] SA Macfarlane read the summary into the record. It provided, in pertinent part, that: "System checks confirmed the validity of Saintilmond's Employment Authorization Card. System checks also confirmed that Saintilmond does not have any approved applications with USCIS that would grant her status nor allow her to remain in the United States. System checks were negative for official crossings at any US border to show lawful entry and negative for prior criminal history. Biometrics and biographical information confirmed that Saintilmond does not have any legal status in the United States." Gov't Ex. 6.

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 6

Airport and the Ferry Terminal, and the port of entry on St. John was at Coral Bay. Customs & Border Protection ("CBP") ran those points of entry. No other places on St. Thomas or St. John were designated by immigration officers where an alien could enter the United States. She explained that, at the border, an individual was required to produce identification and some sort of visa or permission to be in the United States. Asked whether Ms. Saintilmond had any travel documents to be in the United States legally, SA Macfarlane answered in the negative.

On cross-examination, SA Macfarlane testified that, at the point she first encountered Ms. Saintilmond, she was not committing any crimes, she produced legitimate documents that had been issued by the United States Government, she made no effort to flee, and she submitted to authority despite the language barrier. As to the discrepancy between the January 1, 2023 date of entry on Gov't Ex. 3, and the January 1, 2024 date of entry on the other Government exhibits, those dates were taken from applications filled out by Ms. Saintilmond. Her checks of Ms. Saintilmond's border crossing (into the United States) came back with no record of entry indicating admission. The absence of such a record led to the conclusion that she entered illegally. SA Macfarlane also explained that TPS was a status the United States gives to people from various countries experiencing political strife or genocide; it was not indefinite and could be taken away. In her experience, people have applied for both TPS and asylum, where people were fleeing oppressive regimes. She was not aware that the U.S. Department of State had issued "do not travel" advisories to Haiti, but she was personally aware that criminal groups had taken over Port-au-Prince, Haiti. SA Macfarlane

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 7

had not been trained on TPS or asylum; she also did not know that TPS for Haitian citizens was extended through February 2026. She stated that Ms. Saintilmond was arrested after the system check was conducted showing the absence of legal entry into the United States. She recalled that Ms. Saintilmond became ill after she was arrested and was transported to the hospital, but did not know what she was diagnosed with.

On redirect, the Government asked SA Macfarlane to read the banner across the top of Gov't Ex. 7 (Notice of Action for TPS status). It provided: "This notice does not grant any immigration status or benefit." The Court asked SA Macfarlane what the Employment Authorization card permitted Ms. Saintilmond to do in the United States. She answered that it was connected only to work, but not to any benefit status. As to why work authorization was granted to someone not in the country legally, SA Macfarlane stated she did not know.

The Government next called Jodi Luntsford, the Field Office Director of USCIS on St. Thomas. Director Luntsford, who had been with USCIS for 17½ years. She explained that her duties included adjudicating petitions for green cards, such as whether family members could petition on behalf of non-U.S. citizens to immigrate lawfully into the country, but she did not adjudicate asylum applications. She stated that most applications to USCIS are electronic: a person applies on-line and the information is stored in various databases. Generally, a person must be in the United States in order to complete applications.

Director Luntsford testified that Employment Authorization allows a person to work lawfully in the United States, but it does not allow someone to lawfully enter the country, and that fact is clear on the instructions pertaining to that application. She described the Central

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 8

Index System (Gov't Ex. 1) as a repository of information related either to aliens applying for benefits or aliens coming into contact with enforcement due to illegal entry.

According to Director Luntsford, Gov't Ex. 4, a printout of data points regarding Ms. Saintilmond's asylum application, showed that the application had been completed. She added that asylum applications contain sensitive information that is shared only on a "need to know" basis. Based on information in Ex. 4, Director Luntsford reiterated that Ms. Saintilmond's date of entry into the U.S. was January 1, 2024 and she filed her asylum application on April 23, 2024. She added that Defendant's Exhibit 1 was Ms. Saintilmond's asylum application, Form I-589. On that form, Ms. Saintilmond listed her entry into the U.S. as January 1, 2024 at St. John, which matched the information on Gov't Ex. 4. The asylum application showed that a preparer helped Ms. Saintilmond fill it out.

When Director Luntsford last checked Ms. Saintilmond's records the previous evening, she determined that Ms. Saintilmond had been approved for an Employee Authorization card, and that her asylum and TPS application were still pending and not approved. She noted that her office was not located at a designated port of entry and that no one working under her could accept someone into the United States. That determination was left to CPB on St. Thomas and St. John.

On cross-examination, Director Luntsford further discussed TPS and asylum. For TPS, an individual had to be from a certain country and fulfill certain conditions. Haiti was one such country. It was not necessary to prove that a person entered the U.S. legally to be eligible for TPS or asylum. Asked whether Ms. Saintilmond's asylum petition was in process and

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 9

could still be approved, Director Luntsford responded in the affirmative. She also admitted that if that asylum application were granted, then Ms. Saintlimond's illegal entry would be waived. However, none of the admitted exhibits showed that Ms. Saintilmond had entered the United States legally. On redirect, Director Luntsford reiterated that USCIS deals with benefits, regardless of whether a person entered the country legally. Also, while their asylum application was pending, they could file for work authorization, which was an ancillary benefit to the asylum process.

After the Government rested, Attorney Espada moved for a judgment of acquittal, under Fed. R. Crim. P. 29. She asserted that the Government had not met its burden of showing illegal entry. SA Macfarlane was not present when Ms. Saintilmond entered the United States and could not say it was an illegal entry per the statute. Ms. Saintilmond complied with the law and submitted an application for asylum. But even if the Government had proven illegal entry, Ms. Santilmond had shown that the affirmative defenses of duress and justification applied. The record showed that Ms. Saintilmond was running from a country in ruins, with personal danger to herself; the danger she was seeking to avoid in Haiti was less than the harm of violating the law, given that illegal entry is a petty offense. Even without her testimony, the record showed that Haiti was chosen for TPS because of specific reasons where people were running from genocide or absolutist dictatorships. Moreover, if asylum would be granted, then her illegal entry would be waived. The Government prematurely raised this charge, and all the admitted documents showed that her requests were in process and had not been finally adjudicated.

The Government responded that it had presented sufficient evidence on the second element of § 1325(a)(1) that Ms. Saintilmond knowingly entered the United States at a time or place not other than as designated by immigration officer. The testimony showed that the only place designated to enter the United States on St. John was at Coral Bay, run by CBP. There was no border crossing history for the Defendant to show that she entered the United States through any designated place of entry, let alone the one on St. John that she stated in her asylum application that she had entered on January 1, 2024, as corroborated by Government exhibits.

The Defendant then rested, having admitted only Defendant's Ex. 1 and not calling any witnesses. Attorney Espada then made her argument on the Rule 29 motion, which she stated would also be her closing argument.

Attorney Payne pointed out that the Government had presented evidence in this case by Director Luntsford does, explaining what USCIS does—i.e., it provides benefits but does not enforce the law. USCIS's review of benefits does not absolve someone from the crime of illegal entry. For example, Director Luntsford's testimony made it clear that instructions for at least one of the benefits, application for employment authorization that it does not cure an unlawful entry into the United States. This means that Ms. Saintilmond could not present it to SA Macfarlane on April 9, 2025 as a form of identification to allow her to be present in the United States.

Moreover, the timing in this case is different from other illegal entry cases. The evidence pointed to Ms. Saintilmond entered the country by her own admission on January

1, 2024 but did not apply for any benefit until Apil, 2024 when her file was opened. She entered at a place other than one designated as a lawful place by immigration officers. The gap between January and April 2024 cannot be accounted for and say that because she had a pending application, her unlawful entry is waived. While illegal entry is a petty offense, a misdemeanor, the United States goes to great lengths protect its borders and ensure that people enter the country lawfully. The law is being enforced and the elements of illegal entry have been met.

The Court took the matter under advisement.

## DISCUSSION

### I.     The Crime of Illegal Entry

Title 8, Section 1325(a)(1) provides:

> Any alien who enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . shall, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both[.]

8 U.S.C. § 1325(a)(1). The Immigration and Nationality Act ("INA"), of which 8 U.S.C. § 1325 is a provision, defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). "Immigration officer" is defined as "any employee or class of employees of the Service[9] or of the United States designated by the [Secretary of Homeland Security], individually or by regulation, to perform the functions of an immigration officer." 8 U.S.C. §

---

[9] The INA was signed into law before DHS existed, when the Immigration and Naturalization Service, an agency in the Department of Justice, oversaw most immigration-related issues. Parts of the statute still anachronistically refer to the Immigration and Naturalization Service, or "the Service."

1101(a)(18). Virtually any DHS official whose duties relate in some way to immigration activities qualifies as an "immigration officer."[10]

In *United States v. Sajous*, No. 3:25-cr-00036, 2025 WL 2097261 (D.V.I. July 25, 2025), this Court confronted the fact that § 1325 was silent as to any *mens rea* requirement. The Court concluded that it was not a strict liability offense but that the presumptive intent that attached to criminal charges, "knowing," applied to § 1325(a). *Id.* at *8. The Court held that the Government must prove that the defendant (1) is an alien; (2) who *knowingly* entered the United States at any time or place other than as designated by immigration officers

According to the Third Circuit's Model Jury Instructions (Criminal), a person acts knowingly if she

> acts voluntarily and intentionally and not because of mistake or accident or other innocent reason. This means that the government must prove beyond a reasonable doubt that the Defendant was conscious and aware of the nature

---

[10] A separate regulation defines "immigration officer" to mean:

> the following employees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot, immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 CFR 2.1.

8 C.F.R. § 1.2.

> of her actions and of the surrounding facts and circumstances, as specified in the definition of the offense charged." When considering whether a defendant acted "knowingly," the factfinder "may consider evidence about what the Defendant said, what the Defendant did and failed to do, how the Defendant acted, and all the other facts and circumstances shown by the evidence that may prove what was in [the Defendant's] mind at that time.

Third Cir. Model Crim. Jury Instr., § 5.02, https://www.ca3.uscourts.gov/model-criminal-jury-table-contents-and-instructions, last visited 10/22/2025 (citation modified); *see also United States v. Dixon*, 548 U.S. 1, 5 (2006) ("As we have explained, unless the text of the statute dictates a different result, the term "knowingly" merely requires proof of knowledge of the facts that constitute the offense.") (citation modified). Knowledge can be inferred by circumstantial evidence. *United States v. Curran*, 2025 WL 1577564, at *2 (3d Cir. June 4, 2025).

## II. Defendant's Motion for Judgment of Acquittal

### A. Legal Standard

Rule 29 provides that "after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When considering a Rule 29 motion, the Court must view the record in the light most favorable to the prosecution. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006). Moreover, the Court must "be ever vigilant" to avoid "weighing credibility and assigning weight to the evidence." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). In short, the Court should not act as a finder of fact when considering a Rule 29 motion. Instead, the court is limited only to considering whether a factfinder could permissibly find that there was sufficient evidence to support a defendant's

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 14

conviction. *See id.; see also United States v. Frett*, 492 F. Supp 3d 446, 449 (D.V.I. 2020).

### B. Application

The Government's evidence showed that Ms. Saintilmond—an alien from Haiti—was present in the United States without having encountered immigration officials at the border, given that there were no records in any of the DHS databases that she presented herself at the U.S. border with identification and a visa or other permission to enter the United States. *See, e.g.,* Gov't Ex. 6. The Government also presented evidence that Ms. Saintilmond admitted that she entered the United States on January 1, 2024 at St. John, U.S. Virgin Islands, but there was no record of that entry. DHS first opened her file on April 23, 2024, when she filed her asylum application, over three months after her entry. *See* Gov't Ex. 4.

The lack of any DHS records that Ms. Saintilmond had contact with any immigration officials when she entered the United States indicates she arrived at a place or time that was not designated by immigration officers as proper for entry. Moreover, the fact that Ms. Saintilmond ultimately went to immigration officials over three months after her entry into the country could lead a reasonable juror to find that she knew, on the date she entered the country, that her entry was not designated by immigration officers as proper. Considering this evidence in the light most favorable to the prosecution, the Court holds that the Government presented sufficient evidence to allow a reasonable juror to find Ms. Saintilmond guilty of violating § 1325(a)(1) and must therefore deny Ms. Saintilmond's motion for judgment of acquittal.

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 15

### III. Judgment as a Fact Finder

As the trier of fact, the Court must now assign weight to the evidence presented to determine whether the Government has met its burden of proving that Ms. Saintilmond was guilty of violating each element of § 1325 beyond a reasonable doubt. As to the first element—whether Ms. Saintilmond is an alien—the parties stipulated on the record prior to trial that Ms. Saintilmond is an "alien," thereby satisfying the first element of § 1325(a)(1).

Ms. Saintilmond did not testify at trial, and therefore the Court has no direct evidence of her state of mind when she entered the United States on January 1, 2024 or any details at all about her entry, other than the date and place. Her asylum application, Deft's Ex. 1, was admitted into evidence, but it contains no facts regarding the circumstances that caused her to leave Haiti and come to the United States.[11] Thus, the Court can rely only on circumstantial evidence as to whether she knowingly "enter[ed] . . . the United States at any time or place other than as designated by immigration officers[.]" 8 U.S.C. § 1325(a)(1). Given that "knowledge" can be proven by circumstantial evidence, *Curran*, 2025 WL 1577564, at *2, the Court finds that the record contains sufficient circumstantial evidence of that knowledge.

Ms. Saintilmond entered the United States—by her own admission— at St. John on January 1, 2024. Def't Ex. No. 1. All of the Department of Homeland Security databases that SA Macfarlane and Director Luntsford discussed during their respective testimonies

---

[11] For example, in response to numerous questions seeking details as to why she was applying for asylum, if she or her family had experienced harm, mistreatment or threats, or if she feared harm or mistreatment if she returned to her home country, she answered: "I will explain in detail during my interview."

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 16

contained no record of that entry by CBP agents, or *any* entry at the United States border. As a result, SA MacFarlane determined that Ms. Saintilmond's entry into the United States was illegal, based on the absence of such a record. In fact, DHS records revealed that Ms. Saintilmond did not encounter any of the three divisions of the Department of Homeland Security (USCIS, CBP, ICE) until more than three and one-half months after her entry—on April 23, 2024—when she electronically submitted her asylum application. Def't. Ex. 1.

It is reasonable to infer that most people understand that they cannot cross an international border without presenting required documentation and without speaking to and being given permission to enter by immigration authorities. If they do not do so, it is also reasonable to infer that they are seeking to avoid an encounter with those immigration authorities.[12] Once Ms. Saintilmond crossed an international border into St. John, she did not make any attempt to ensure that her entry was lawful by contacting any authorities. Rather, she remained in the United States for over three months, unknown to the authorities, until she filed an asylum application. In the absence of any contradictory evidence, these facts provide significant circumstantial evidence that Ms. Saintilmond knowingly entered the United States at a time or place other than as designated by immigration officers and that the Government proved this element of the illegal entry crime beyond a reasonable doubt.

As made clear through the testimony of SA Macfarlane and Director Luntsford, the

---

[12] As the Court observed in *Sajous*, 2025 WL 2097261, at *8 n.15, "an alien who entered the United States and then avoided all contact with immigration officials cannot claim that they did not know they needed to enter the country at a place designated as proper by immigration officers."

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 17

fact that Ms. Saintilmond received employment authorization and had pending TPS and asylum applications did not serve to grant her any immigration status or benefit. In other words, the employment authorization and pending applications did not retroactively legalize the fact that she entered the United States at a time and place other than as designated by immigration officers.

During the argument on her Rule 29 motion, Attorney Espada argued that, if the Court concluded that the Government had proven illegal entry, the affirmative defenses of duress and justification applied such that Ms. Saintilmond should be found not guilty. These defenses each have four elements that must be proven by a preponderance of the evidence.[13] Each element requires that the Defendant provide specific facts that relate to the dangerous conditions she faced and that there was no alternative to avoid that harm except to violate the law. While counsel spoke in general terms about the difficult conditions in Haiti that

---

[13] To find a defendant not guilty because of duress, the factfinder must find by a preponderance of the evidence that the Defendant: (1) faced an immediate threat of death or serious bodily injury; (2) held a well-grounded fear that the threat would be carried out; (3) there was no reasonable opportunity to escape the threatened harm; and (4) did not recklessly place himself in a situation in which he would be forced to engage in criminal conduct. *United States v. Miller*, 59 F.3d 417, 422 (3d Cir. 1995). The elements of a justification defense are: "First, that the defendant was under an immediate, unlawful threat of death or serious bodily injury to himself or to others; Second, that the defendant had a well-grounded or reasonable fear that the threat would be carried out if he did not commit the offense; Third, that the defendant's criminal action was directly caused by the need to avoid the threatened harm and that the defendant had no reasonable, lawful opportunity to avoid the threatened harm without committing the offense; that is, that the defendant had no reasonable lawful opportunity both to refuse to do the criminal act and also to avoid the threatened harm; and Fourth, that the defendant had not recklessly placed himself in a situation in which he would be forced to engage in criminal conduct." *United States v. Taylor*, 686 F.3d 182, 186 (3d Cir. 2012) (quoting Third Cir. Model Crim. Jury Instr. § 8.04 (citation modified)).

*United States v. Saintilmond*
3:25-cr-00035-RAM-EAH
Memorandum Opinion and Order
Page 18

prompted the United States to declare that Haitians coming to the United States would be eligible for Temporary Protected Status, she did not refer to how Ms. Santilmond met each element of those affirmative defenses. Given that Ms. Saintilmond did not testify, and her asylum application was devoid of any facts that would support the defenses of duress or justification, the Court concludes that the Defendant did not prove either affirmative defense by a preponderance of the evidence to find her not guilty.

## CONCLUSION

For the reasons set forth above, the Court hereby **FINDS** that Ms. Saintilmond is **GUILTY** of Count One of the Information, entering the United States at a time and place other than as designated by an immigration officer in violation of 8 U.S.C. § 1325(a)(1).

Furthermore, the Court hereby **ORDERS** that Ms. Saintilmond's oral Motion for Judgment of Acquittal is **DENIED**.

ENTER:

Dated: October 28, 2025

/s/ Emile A. Henderson III
EMILE A. HENDERSON III
U.S. MAGISTRATE JUDGE